**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DISTRICT**

| | | |
|---|---|---|
| THE INSTITUTE OF MANAGEMENT AND ADMINISTRATION, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-05-1853 |
| BROADBAND INTELLIGENCE, INC., *et al.*, | * | |
| Defendants. | * | |

****

<u>**MEMORANDUM OPINION**</u>

The Institute of Management and Administration, Inc. ("IOMA" or "Plaintiff") brings this action against Broadband Intelligence, Inc. ("BII") and Cynthia Brumfield ("Brumfield") (collectively, "Defendants") asserting breach of contract, violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), federal and common law trademark infringement, and breach of the common law fiduciary duty of loyalty. Defendants have responded to Plaintiff's Complaint with three motions, all of which are currently pending before the Court: a Motion to Dismiss or, in the Alternative, for Summary Judgment [5]; a Motion to Strike [6]; and a Motion for Attorneys' Fees Pursuant to 15 U.S.C. § 1117(a) [7]. The Court has reviewed the entire record, as well as the pleadings with respect to the instant motions. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will will GRANT Defendants' Motion to Strike, DENY Defendants' Motion for Attorneys' Fees, and GRANT-in-part and DENY-in-part Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Specifically, Defendants' Motion to Dismiss will be GRANTED as to Counts I and II and DENIED as to Counts

1

III, IV, V, and VI.

## I.      FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. Brumfield is communications media analyst and "a top expert on cable, broadband, and new media development." (Defs.' Mot. to Dismiss 2.) In 1999, Brumfield founded Broadband Intelligence, Inc. ("BII"), through which she published "Broadband Daily," a web-based newsletter covering the broadband market.[1] In 2003, Pike & Fischer ("P&F")[2], a provider of "authoritative business and legal reference services," entered into negotiations with Brumfield to purchase the "Publishing Assets" of BII—namely, Broadband Daily and associated assets such as subscriber lists, marketing materials, trial subscriptions, and back issues—and to hire Brumfield to serve as its telecommunications industry expert. The negotiations culminated in an agreement under which BII's Publishing Assets were transferred to P&F and Brumfield was hired as Director of P&F's "CMA Group," "an umbrella department at P&F responsible for all telecommunications products and services, including the newly purchased Broadband Daily." (Compl. 2.) In connection with the asset sale, both Brumfield and BII entered into non-compete agreements with P&F. Although the precise scope of the non-compete covenants is presently a subject of considerable dispute, the agreements provided, in essence, that BII would not publish information on the broadband market for a period of three years, and that Brumfield would refrain from providing consulting services to P&F customers for one year

---

[1]"The term 'broadband' can be defined as a high-bandwidth communications connection, but is synonymous in most consumers' minds with high-speed, always-on Internet service." (Defs.' Mot. to Dismiss 2.)

[2]Plaintiff IOMA is Pike &Fischer's successor in interest by way of corporate merger. (Compl. ¶ 3.)

following her termination.

According to Plaintiff, Brumfield's tenure as Director of P&F's CMA Group was brief and tempestuous. Following a number of incidents in which Brumfield is alleged to have angrily berated her coworkers, P&F terminated Brumfield's employment on February 23, 2005. Following her termination, P&F reminded Brumfield of the non-compete agreements she had signed. Brumfield responded by assuring P&F that, although she had plans to form a new company called Broadband Insight, she fully intended to abide by the agreements. Subsequent events, however, led P&F to suspect that Brumfield had misappropriated certain assets and trade secrets of P&F and intended to make use of them to establish her new business. For example, when Brumfield returned her corporate laptop computer, P&F discovered that Brumfield had used a sophisticated software to wipe the hard drive clean. P&F also discovered the existence of an electronic folder on a computer server owned and maintained by CoEfficient Technologies, the host of P&F's website, titled "binsight-sites." This folder contained confidential information relating to P&F's clients and business, including 61 "trackers," which are "quantitative spreadsheets which contain formulas for projecting growth rates in the telecommunications service industry" and are "the primary tool used by P&F to track, analyze, and report on industry and company trends in the telecommunications industry." (Compl. ¶ 55.) Plaintiff alleges that the "binsight-sites" folder was maintained by Brumfield, who intended to use its contents for the benefit of Broadband Insight, her new company. In addition, as evidence of Brumfield's alleged intention to violate the terms of the non-compete agreements, Plaintiff points to a March 21, 2005 email sent by Brumfield to various parties announcing the creation of Broadband Insight, which is described as a "strategic advisory services and publication company focused on IP media." (*Id.* ¶ 63.) The email advises recipients to "[s]tay

3

tuned for some exciting reports, publications and events focused on the cutting-edge world of new

IP applications" and invites them to visit Broadband Insight's new website. (*Id.*) Plaintiff contends

that the services and publications offered by Broadband Insight are analogous to those furnished by

P&F, and that the website for Broadband Insight is essentially a copy of the website for Broadband

Daily.[3]

On July 8, 2005, Plaintiff filed a six-count Complaint in this Court. Count I alleges that

Defendant Brumfield breached her covenant not to compete with P&F. Count II alleges that

Defendant BII also breached its non-compete agreement. Count III alleges that Defendants violated

the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-1201 *et seq.* (1989)

("MUTSA"). Count IV alleges that Defendants violated federal trademark law. Count V alleges that

Defendants are liable for common law trademark infringement. Count VI alleges that Defendant

Brumfield breached her common law duty of loyalty to P&F.

On August 4, 2005, Defendants filed a Rule 12(b)(6) Motion to Dismiss, or in the

Alternative, for Summary Judgment. Defendants also filed a Rule 12(f) Motion to Strike, contending

that certain portions of Plaintiff's Complaint are "immaterial, impertinent, and/or scandalous," and

a Motion for Attorneys Fees Pursuant to 15 U.S.C. § 1117(a). Those motions are ripe and ready for

resolution, and the Court now issues this opinion.

## II.   DEFENDANTS' MOTION TO STRIKE

Fed. R. Civ. P. 12(f) provides that "the court may order stricken from any pleading . . . any

---

[3]The Broadband Insight website is no longer functioning. Defendants assert that it was taken down following Brumfield's discovery that "Broadband Insight" is the registered mark of a third party and that Quantum Web, a United Kingdom firm, publishes a twice monthly report called Broadband Insight.

redundant, immaterial, impertinent, or scandalous matter." Although courts are granted "considerable discretion" in determining whether to grant relief under Rule 12(f), *see Xerox Corp. v. Imatek, Inc.*, 220 F.R.D. 244, 245 (D. Md. 2004), motions to strike are disfavored and will be denied "unless the matter under challenge has no possible relation to the controversy and may prejudice the other party." *Star Scientific, Inc v. R.J. Reynolds Tobacco Co.*, 174 F. Supp. 2d 388, 396 (D. Md. 2001) (internal citations and quotation marks omitted).

Here, Defendants have filed a motion to strike allegations in paragraphs 39, 40, and 41 of the Complaint relating to Brumfield's alleged lack of management skills and frequent clashes with both superiors and subordinates. Defendants urge the Court to strike paragraphs 39 and 40 in their entirety, and to strike the first nine words of paragraph 41. Plaintiff argues that this language should not be stricken because it is both relevant and nonprejudicial. This Court cannot agree. Counts I, II, IV, and V are based on Brumfield's alleged actions *after* her termination from P&F—therefore, the Court does not see the relevance of interpersonal clashes that may have occurred prior to her dismissal. To the extent that Count III—Brumfield's alleged misappropriation of trade secrets—and Count VI—Brumfield's alleged breach of the duty of loyalty—may be based on events preceding her termination, Brumfield's purportedly contentious relations her coworkers have no bearing on these particular claims.

Plaintiff suggests that Brumfield is likely to defend this action by arguing that she was terminated without cause, and that the disputed allegations are relevant because they establish that P&F had ample cause to dismiss her. Plaintiff also argues that the events preceding her dismissal are relevant to any counterclaim that Brumfield may raise when an answer is filed. At this juncture, the Court does not find such highly speculative arguments to be convincing. Should Brumfield assert

any counterclaims based on the manner and circumstances of her dismissal, Plaintiff will have the opportunity to respond at the appropriate time. In addition, the Court would be willing to entertain a Rule 15(a) motion for amendment of the pleadings if the parties should subsequently find it necessary.

Finally, the Court finds that the apparently gratuitous attacks on Brumfield's professionalism contained in the challenged language are prejudicial. There is no merit to Plaintiff's argument that, because Brumfield is now self-employed, allegations suggesting that she is essentially incapable of working with others will cause her no prejudice. As a self-employed professional, Brumfield's reputation is crucial to her ability to attract and retain clients, and she may at any time seek to once again join a company or other organization. Thus, because the Court finds that Plaintiff chose to use "inflammatory language that is not in keeping with the spirit of notice pleading contemplated by the Federal Rules of Civil Procedure," *Schultz v. Braga*, 290 F. Supp. 2d 637, 655 (D. Md. 2003), and that such language is prejudicial to Brumfield's reputation, Defendants' Motion to Strike will be granted.

## III.   DEFENDANTS' MOTION FOR ATTORNEYS' FEES

Count IV of the Complaint asserts a claim of federal unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act provides that in "exceptional" cases, the prevailing party may be awarded reasonable attorneys' fees. 15 U.S.C. § 1117(a). A case is "exceptional" when it involves economic coercion or groundless arguments, *Ale House Management, Inc. v. Ralaigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000), or "malicious, fraudulent, deliberate and willful behavior." *The Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1992). Defendants, arguing that there is no merit to Plaintiff's

Lanham Act claim, urge the Court to dismiss or enter judgment in their favor on Count IV and to award them with attorneys' fees. The Court finds, however, that Plaintiff has stated a claim for unfair competition under the Lanham Act. *See* discussion *infra*. As such, there is no "prevailing party" at the present time, and Defendants' Motion for Attorneys' Fees Pursuant to 15 U.S.C. § 1117(a) must be denied.

**IV.**     **DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**A.**     **Rule 12(b)(6) Conversion**

Defendants have filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment. When "matters outside the pleadings are presented to and not excluded by the court, [a 12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). In interpreting the requirements of this rule, the Fourth Circuit has held that the term "reasonable opportunity" requires that all parties be given "some indication by the court . . . that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits and pursue reasonable discovery." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citations and quotations omitted). However, when a party is "aware that material outside the pleadings is before the court," the party has notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment. *Id.* Even so, notification that a Rule 12(b)(6) motion may be converted is only one of the requirements of Rule 12. Before a Rule 12(b)(6) motion may be converted and summary judgment granted, the court must be satisfied that the nonmoving party "has . . . had the opportunity to

discover information that is essential to [its] opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (citations omitted).

In the instant case, Plaintiff had adequate notice that Defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are themselves sufficient indicia. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). Still, notice is not enough. Once notified, a party must be afforded a "reasonable opportunity for discovery" before a Rule 12(b)(6) motion may be converted and summary judgment granted. *Gay*, 761 F.2d at 177. Here, there has been no discovery in this case. Until the facts have been developed by way of appropriate discovery procedures, the Court will not undertake to consider whether summary judgment should be entered in favor of either party. *Jordan v. Washington Mut. Bank*, 211 F. Supp. 2d 670, 674 (D. Md. 2002).[4] Therefore, the Court will analyze

---

[4]Defendants argue that "[a] party opposing a motion for summary judgment by claiming a need for discovery is obligated to set out reasons for the need for discovery in an affidavit pursuant to Rule 56(f)." (Defs.' Rep. at 3 (citing *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) and *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)). Plaintiff has not filed a Rule 56(f) affidavit. The cases that Defendants rely upon, however, involve summary judgment motions filed after discovery has taken place; here, because the Court has yet to enter a scheduling order, the discovery process has not yet commenced. *See* Local Rule 104.4 (D. Md. 2004). Furthermore, while a party opposing a motion for summary judgment on the basis of insufficient opportunity for discovery must ordinarily file a Rule 56(f) affidavit, *see Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir. 1996), exceptions have been recognized. "When the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and when fact-intensive issues . . . are involved, courts have not always insisted on a Rule 56(f) affidavit if the nonmoving party has adequately informed the court that the motion is pre-mature and that more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). In the instant case, Plaintiff, in its Opposition to Defendants' Motion to Dismiss or, in alternative, for Summary Judgment, asserts that Defendants' motion is premature, explicitly requests the opportunity to conduct discovery, and indicates which particular issues of factual dispute it seeks to develop. (*See* Pl.'s Opp. 9, 27.) As such, the Court will construe Plaintiff's objections as "the functional equivalent of a [Rule 56(f)] affidavit." *First Chicago Int'l v. United Exch. Co., Ltd.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988).

Defendants' motion under a 12(b)(6) standard, and, accordingly, the Court's analysis will be limited to the sufficiency of the pleadings combined with those materials referenced in the Complaint. Here, Plaintiff has attached Exhibits A-F to the Complaint. Accordingly, the Court will construe these attachments under the Rule 12(b)(6) analysis.

**B.      Motion to Dismiss Under Rule 12(b)(6)**

Under Rule 12(b)(6), dismissal of a complaint for failure to state a claim is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   In determining whether to dismiss a complaint pursuant to Rule 12(b)(6), this Court must view the well-pleaded material allegations in the light most favorable to the plaintiff and accept the factual allegations contained within the plaintiff's complaint as true. *See Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997) (*citing Estate Constr. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 217-18 (4th Cir. 1994)); *Chisolm v. TranSouth Finan. Corp.*, 95 F.3d 331, 334 (4th Cir. 1996).

The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citing *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981)); *Young v. City of Mount Ranier*, 238 F.3d 576, 577 (4th Cir. 2001) (the mere "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)"). Nor is the Court "bound to accept [Plaintiff's] conclusory allegations regarding the legal effect of the facts alleged." *United Mine Workers of Am. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1994); *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). Thus, a complaint may be dismissed as a matter of law if it lacks a cognizable legal theory *or* if it alleges insufficient

facts to support a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d

530, 533-34 (9th Cir. 1984) (citing 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed.

1982)).

## DISCUSSION

### Count I - Brumfield's Covenant Not To Compete

Brumfield's offer of employment from P&F reads, in part:

> For a period of one (1) year after the date of termination of your
> employment with Pike & Fischer, Inc. (for any reason), you agree
> that you will not perform any consulting services dealing with the
> same subject as any P&F publishing asset for any active P&F
> customer as of the date of termination.

(Compl., Ex. B.) IOMA argues that Brumfield evidenced her intention to violate this clause when

she sent out a mass email stating that her new company will offer "strategic advisory services,"

which IOMA contends "is simply another way of saying consulting services." (*Id.* ¶ 88.) IOMA

alleges that this email was received by P&F customers. (*Id.*) In addition, IOMA argues that certain

language on the Broadband Insight website, launched by Brumfield after her dismissal from P&F,

demonstrates her intent to violate the non-compete covenant; allegedly, the website stated[5] that

Broadband Insight was a provider of "strategically valuable, in-depth analysis and *consulting*

*services* to companies in the burgeoning broadband arena." (Id. ¶ 89) (emphasis added.) Plaintiff

now seeks compensatory damages and injunctive relief.

In response, Defendants argue that this count must be dismissed, pursuant to Rule 12(b)(6),

for failure to state a claim. They note that Plaintiff has failed to allege that Brumfield actually

violated the agreement by performing consulting services for P&F clients. In addition, Defendants

---

[5]As noted above, the Broadband Insight website is no longer operational.

contend that the non-compete agreement must be narrowly construed to apply solely to P&F consulting customers, rather than to all P&F customers (as Plaintiff urges). Defendants assert that P&F had only one consulting customer on the date of Brumfield's dismissal, and that Brumfield has not performed any consulting work for this particular client.

Under Maryland law,[6] in order to state a claim for breach of contract, a plaintiff must allege "with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by the defendant." *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 369 A.2d 566, 569 (Md. 1977). In a cause of action for breach of a covenant not to compete, the requisite elements include: (1) the existence of a valid contract or relationship to which the covenant is ancillary; (2) the validity of the covenant under contract principles; (3) the reasonableness of the restrictions imposed by the covenant; (4) and a breach of the restrictions by the defendant. *See* Elizabeth Williams, *Cause of Action to Enforce Anticompetition Covenant in Employment Contract*, 11 COA2d 375, §2 (2005). In addition, to survive a motion to dismiss, the elements constituting a prima facie case for breach of contract must be stated in the complaint or counterclaim. *See Waterfront Guard Assoc. v. Amstar Corp.*, 363 F. Supp. 1026, 1030 (D. Md. 1973).

Here, the non-compete clause prohibits Brumfield, for the twelve months following her termination, from "perform[ing] consulting services dealing with the same subject as any P&F

_____

[6]A federal court sitting in diversity jurisdiction applies the choice of law provisions of the forum state, which in this case is Maryland. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Absent a choice-of-law provision in a contract, Maryland adheres to the doctrine of *lex loci contractus,* under which the law of the jurisdiction where the contract was made controls its validity and construction. *See Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). Here, the parties are in agreement that the contracts *sub judice* are governed by Maryland law.

publishing asset for any active P&F customer as of the date of termination." (Compl., Ex. B.) Although the parties disagree over the meaning of the contractual terms "any P&F publishing asset" and "any active P&F customer," there is no dispute over the type of activity the non-compete covenant is intended to prevent—namely, consulting services performed by Defendant Brumfield. In other words,while there is disagreement over "for whom" and "on what" Brumfield may consult, it is clear that in order to state a claim for breach of the covenant, Plaintiff must allege that Brumfield "perform[ed] consulting services" for somebody. IOMA's Complaint fails to allege any facts in support of this crucial element; it leaps from discussing Brumfield's "intent to provide consulting services," (*Id.* ¶¶ 87-89), to conclusorily stating that her "failure to refrain from providing consulting services . . . is a material breach of [her] obligations under the Employment Letter." (*Id.* ¶ 91.) Significantly, the Complaint is void of of any factual allegation that Brumfield actually performed consulting services for "any active P&F customer," consulting or otherwise. As such, the Complaint fails to state a claim for breach of the covenant not to compete.

This Court is mindful that under the federal standards of notice pleading, a claim should not be dismissed pursuant to Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), and that a plaintiff need only "set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) (quoting *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir. 1990)). Even so, complaints "which on critical elements of a claim merely recite legal conclusions wholly devoid of facts may properly be dismissed for insufficiency of statement." *Revene v. Charles County Comm'rs*,

882 F.2d 870, 875 (4th Cir. 1989) (internal citations and quotation marks omitted). The federal rules require that a complaint "allege facts that, if proven, would provide an adequate basis for each claim." *Gray v. Dane County*, 854 F.2d 179, 182 (7th Cir. 1988); *see also South Road Assocs. v. Int'l Bus. Machs. Corp.*, 216 F.3d 251, 253 (2d Cir. 2000) ("To survive a motion for dismissal under Rule 12(b)(6), the complaint must allege facts that, if true, would create a judicially cognizable cause of action.")

In the instant case, the Complaint asserts a claim for breach of contract, yet fails to allege facts that, if true, would establish that Brumfield breached the non-compete agreement. While the Complaint makes reference to a mass email sent by Brumfield which reached P&F customers, the non-compete clause does not prohibit Brumfield from contacting or even soliciting former customers—instead, it bars her only from providing them with consulting services. Plaintiff has not cited a single P&F customer for whom Brumfield performed consulting services. *Cf. Shapiro, Olesky & Co. v. Cohen*, 2003 WL 21654161, at * 2 (N.D. Ill. 2003) (in action for breach of non-compete covenant, defendant's 12(b)(6) motion denied when complaint included allegation that defendant performed services for a specific former customer).  The Court recognizes that Brumfield herself is the party best situated to provide evidence as to whether she breached the non-compete covenant, and that Plaintiff may hope to produce such evidence through discovery. However, "plaintiffs cannot simply promise the court that once they have completed discovery, something will turn up. Rather, before they are permitted to proceed to discovery, plaintiffs must have some factual basis for believing that a legal violation has actually occurred." *Migdal v. Rowe-Price-Fleming Intern., Inc.*, 248 F.3d 321, 328 (4th Cir. 2001). The Court finds that the requisite factual basis for sustaining

Plaintiff's claim is absent here.[7] Thus, because Plaintiff has failed to plead facts alleging that Brumfield violated the covenant not to compete by performing consulting services for a P&F client, Count I will be dismissed for failure to state a claim.

<u>Count II - BII's Covenant Not To Compete</u>

The Agreement for Purchase of Publishing Assets between P&F and BII contains a non-compete clause that, for a three-year period, prohibits BII from directly or indirectly participating in the "publishing of any 'publication' (which . . . shall mean any publication containing news, analysis, and/or comment on or of current or recent events) in print or by any electronic or other means of dissemination dealing with the same subject matter as any of the Publishing Assets." (Compl. Ex. A.) The "Publishing Assets" are separately defined; they consist primarily of BII's Broadband Daily publication and associated assets such as subscriber lists, marketing materials, trial subscriptions, and back issues. The Agreement also provides for injunctive relief in the event that there is a breach of the restrictive covenant. In consideration of BII's agreement to the covenant not to compete and to injunctive relief, P&F agreed to pay BII royalties for a period of three years from the revenue generated by Broadband Daily.

Plaintiff now alleges that BII violated the restrictive covenant. As evidence of BII's alleged breach, Plaintiff points to the Broadband Insight website that Brumfield established—and has since taken down—following her dismissal from P&F. Plaintiff suggests that Broadband Insight is really just a new name for Broadband Intelligence (BII), and that Broadband Insight was created for the sole purpose of the evading the restrictions imposed by the covenant. When it was operational, the Broadband Insight website allegedly offered the following services:

---

[7]If subsequent discovery provides Plaintiff with a specific factual basis for its breach of contract claim, Plaintiff may move for leave to amend its Complaint accordingly.

> (i) in-depth coverage of the latest developments driving the high-speed, IP-enabled communications services; (ii) analysis of the key companies driving the development of new broadband and IP-enabled services; and (iii) up-to-date and thorough status reports on the financial, operating and technology development status of major broadband providers, technology vendors and content suppliers.

(Compl. ¶ 103.) Plaintiff asserts that it, too, offers the services listed above. In addition, Plaintiff alleges that the Broadband Insight website stated that it would soon begin publishing "insightful reports on emerging communications technologies and the IP media world." (Compl. ¶ 105.) Plaintiff claims that publications of this type would fall within the scope of the publications that BII is prohibited from disseminating under the non-compete agreement.

The Court finds that Count II contains the same deficiency as Count I—failure to allege facts that, if true, would establish a breach of the relevant covenant not to compete. BII's covenant bars it from "publishing . . . any publication . . . dealing with the same subject matter as any of the Publishing Assets." Thus, in order to state a claim for breach of contract, Plaintiff must allege that BII (1) issued a publication (2) addressing a matter contained within the Publishing Assets. The Complaint lacks any such factual allegation.[8] At most, it alleges that BII has stated its intent—on a website that is no longer operational—to one day publish on matters that might be construed as

---

[8]In its Opposition Brief, Plaintiff points to a specific publication —"IP Media Monitor"—which it alleges was published in violation of the non-compete agreement. (Pl.'s Opp. to Defs.' Mot. to Dismiss 19.) Factual allegations raised for the first time in a reply brief may not be considered in opposition to a motion to dismiss. *See, e.g., Black v. Lane,* 22 F.3d 1395, 1408 (7th Cir. 1994) (inappropriate for court to cure plaintiff's complaint "by discovering the missing allegations in a reply brief, which is neither a complaint or an amendment to a complaint") (internal citation and quotation marks ommitted); *Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) (refusing to consider factual allegations initially raised in a reply brief). However, if this or some other publication unveiled through discovery provides Plaintiff with an adequate factual basis for its breach of the covenant not to compete claim, Plaintiff may move for leave to amend its Complaint accordingly.

falling within the scope of the covenant. Accordingly, the Court finds that Plaintiff has failed to state a claim against BII for breach of the covenant not to compete.

<u>Count III - Misappropriation of Trade Secrets</u>

Count III of the Complaint alleges that Defendants violated the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-1201 *et seq.* (1989) ("MUTSA"). This claim centers on P&F's discovery of an electronic folder on a computer server owned and maintained by CoEfficient Technologies, the host of P&F's website, titled "binsight-sites." This folder contained confidential information relating to P&F's clients and business, including 61 "trackers," which are spreadsheets containing proprietary formulas for projecting growth rates in the telecommunications industry. Plaintiff alleges that the "binsight-sites" folder was maintained by Brumfield, who intended to use its contents for the benefit of her new company.

Defendants assert that Brumfield had no knowledge of, or connection to, the "binsight-sites" folder. In support, Defendants have submitted an affidavit from Dennis K. Moore ("Moore"), the co-owner of CoEfficient Technologies, stating that he independently created the "binsight-sites" folder and placed the tracker files within it when performing maintenance on P&F's website. Moore asserts that Brumfield had no access to the folder and that it was not created at her request or direction. While this affidavit does, at first blush, appear dispositive of Plaintiff's MUTSA claim, Plaintiff points out that it has not had the opportunity to depose Moore or to otherwise conduct any discovery in this case. Plaintiff also questions why a folder created on behalf of P&F and CoEfficient Technologies would be titled "binsight-sites," a name seemingly derived from "Broadband Insight," Defendants' new website.

Because the Court is treating Defendants' Motion to Dismiss or, in the Alternative, for

16

Summary Judgment as a motion to dismiss pursuant to Rule 12(b)(6), the Court will, for the time

being, disregard Moore's affidavit and limit its analysis to the sufficiency of the pleadings and the

materials referenced in the Complaint. Under the 12(b)(6) standard, the Court finds that Plaintiff's

allegations are sufficient to state a claim under MUTSA.

MUTSA makes actionable the use or disclosure of a "trade secret" acquired through

"improper means." *See Padco Advisors, Inc. v. Omdahl,* 179 F. Supp. 2d 600, 609-12 (D. Md. 2002).

The parties do not appear to dispute that the trackers may qualify as "trade secret."[9] Defendants

maintain, however, that because Brumfield was the original author of the trackers and had access

to them during her employment at P&F,  Plaintiff cannot establish that Brumfield later acquired

them by "improper means."[10] Defendants cite *Diamond v. T. Rowe Price Associates, Inc.*, 852 F.

Supp. 372 (D. Md. 1994), in which an investment management firm asserted a claim under MUTSA

---

[9]The Code defines a "trade secret" as:

> information, including a formula, pattern, compilation, program,
> device, method, technique, or process that:
> (1) Derives independent economic value, actual or potential, from
> not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value
> from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

Md. Code Ann., Com. Law § 11-201(e). In their motion to dismiss, Defendants raise the
possibility that, depending upon their age, the trackers may no longer qualify as trade secrets;
because the data they contain is time-sensitive and subject to many variables, the trackers'
economic value will rapidly decline if they are not updated with new information. Whether the
particular trackers that Plaintiff alleges were misappropriated may still qualify as trade secrets is
a factual issue that cannot be resolved at this early stage in the litigation.

[10]"Improper means" include "theft, bribery, misrepresentation, breach or inducement of a
breach of a duty to maintain secrecy, or espionage through electronic or other means." Md. Code
Ann., Com. Law § 11-201(b).

against a discharged employee on the basis of documents she maintained in her home office. The court granted summary judgment as to the MUTSA claim, finding that the employer had proffered no evidence that the employee improperly acquired the files or disclosed their contents to others. *Id.* at 412. This finding was largely based, however, on the fact that the employee often worked from home and had legitimate reasons to maintain the files in question in her home office. The court noted that the employer "allowed her to work from home, regularly sent documents to her home, and cannot now complain that her possession of these documents violates MUTSA." *Id.* n.193. Thus, *Diamond* readily distinguishable from the case at hand. Here, Plaintiff's misappropriation claim is not based on documents that Brumfield may have maintained on her corporate laptop or home PC in order to more effectively perform her work. Instead, Plaintiff alleges that Brumfield, without P&F's knowledge or consent, copied the trackers to a hidden directory so that she could subsequently use them to compete with her former employer. These allegations are more analogous to the facts of *LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451 (Md. 2004), in which an employee copied numerous company documents onto compact discs prior to his departure to work for his employer's competitor. The Maryland Court of Appeals found little merit in the employees's argument that, because his employer had provided him with the documents, he did not acquire them through improper means. *Id.* at 466 The court noted that the defendant "did not merely hold on to documents that had been sent to his home" but rather "selected specific, confidential . . . documents and actively transferred them . . . to a CD that he intended to keep for his personal use." *Id.* at 467. This was sufficient for the court to find that the defendant hads acquired the documents through "improper means." Here, too, Plaintiff alleges that Brumfield actively copied certain confidential documents for subsequent personal use. These allegations are adequate to state a claim that

Brumfield acquired the trackers through improper means. Accordingly, Defendants' motion to dismiss Count III of the Complaint shall be denied.

<u>Count IV - Federal Unfair Competition</u>

Count IV asserts a claim of federal unfair competition under the Lanham Act, 15 U.S.C. § 1125. Plaintiff argues that it holds a valid trademark with respect to the words "Broadband Daily" and the stylized Broadband Daily logo. Plaintiff alleges that the Broadband Insight website, which was operational for several months following Brumfield's termination from P&F, was designed to emulate the Broadband Daily website. Plaintiff suggests that certain similarities between the layout and the logos of the two sites would likely to mislead consumers "to believe that the services and goods offered by Broadband Insight are offered by, sponsored by, approved by, originate with, or are affiliated with Broadband Daily." (Compl. ¶ 123.)

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, protects registered and unregistered marks against the use of any word, term, symbol, or mark that is likely to confuse consumers about the origin of the mark. *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 651 (D. Md. 2002). Section 1125(a)(1)(A) provides, in relevant part, that:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

19

15 U.S.C. § 1125(a)(1)(A). In order to establish a claim under Section 43(a), a plaintiff must show (1) that it has a valid, protected trademark and (2) that the defendant's use of a similar trademark is likely to cause confusion among consumers. *Id.* (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)). Here, the "Broadband Daily" mark was registered with the United States Patent and Trademark Office.[11] Federal registration "serves as *prima facie* evidence that the registrant owns the registered mark, has properly registered it under the Lanham Act, and it entitled to its exclusive use in commerce." *Brittingham v. Jenkins*, 914 F.2d 447, 452 (4th Cir. 1990); *see also* 15 U.S.C. § 1057(b). In addition, Defendants have not challenged the validity of the "Broadband Daily" mark, arguing instead that they have not used a sufficiently similar mark and that there is no likelihood of customer confusion. As such, the Court will presume that Plaintiff holds a valid, protected trademark, and move on to the second prong of the inquiry.

"The touchstone of a section 1125(a)(1)(A) unfair competition claim is whether the defendant's actions are likely to cause confusion." *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 923 (Fed. Cir. 1995) (internal citations and quotation marks omitted). In determining whether a likelihood of confusion exists, courts must consider the following factors: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their business; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). These factors need not necessarily be given equal weight; rather, the determination is made on a case-by-case

---

[11]Defendants registered the "Broadband Daily" word mark prior to selling Broadband Intelligence's assets, which included Broadband Daily, to P&F. Plaintiff subsequently acquired the mark pursuant to the Asset Purchase Agreement.

basis. *See id.*; *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463 (4th Cir. 1996); *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992). At the same time, the Fourth Circuit has indicated that the seventh factor, actual confusion, "is often paramount. When the plaintiff's mark is strong and the defendant's use of a similar mark 'has actually confused the public, our inquiry ends almost as soon as it begins.'" *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001) (quoting *Sara Lee Corp.*, 81 F.3d at 467)).

Here, Plaintiff asserts that there has been actual confusion. Plaintiff cites an email from a P&F customer stating: "I guess this means that Cynthia [Brumfield] is no longer with you? Is she still working in any capacity with you guys? We were just wondering since her new company logo is SO similar to the original logo." (Compl. ¶ 65.) Defendants argue that, rather than demonstrating any confusion, the emailer "correctly noted that Brumfield was no longer with P&F and asked if there was any continuing relationship. . . . The consumer apparently knew of the prior relationship, understood from the message that the relationship had changed, and was inquiring of its status." (Defs.' Mot. 15.)

The Court finds that this email, standing alone, is inconclusive as to whether there was actual confusion over a possible link between Broadband Daily and Broadband Insight. While the emailer ostensibly understood that Brumfield's employment with P&F had terminated, the apparent similarity between the Broadband Daily and Broadband Insight logos prompted the emailer to inquire as to whether there was any continuing relationship between the parties. Thus, there appears to merit to both sides' intepretations of the email's significance. In any case, likelihood of confusion is generally regarded as a question of fact that should not be decided in a Rule 12(b)(6) motion to dismiss or in a motion for summary judgment. *See, e.g., Society of Financial Examiners v. National*

*Association of Certified Fraud Examiners*, 41 F.3d 223, 225 (5th Cir. 1995); *Croydon Co., Inc. v. Unique Furnishings, Ltd.*, 831 F. Supp. 480, 487 (E.D.N.C. 1993) (likelihood of confusion is a factual question "especially ill-suited for summary disposition"); *Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.*, 627 F. Supp. 856 (E.D. Pa. 1985) ("Dismissal pursuant to Rule 12(b)(6) is appropriate in only the most extreme trademark infringement and unfair competition cases, such as where the goods are unrelated as a matter of law."). Plaintiff should be allowed to proffer additional evidence of actual confusion, if available, before this Court issues a ruling on the merits of its unfair competition claim.

Defendants also argue that Plaintiff's Lanham Act claim must be dismissed because there was no likelihood of consumer confusion after the Broadband Insight website was redesigned in the spring of 2005, and because the Broadband Insight website is itself no longer operational. In addition, Defendants argue that Plaintiff has abandoned its use of the original Broadband Daily mark, citing Plaintiff's redesign of the Broadband Daily website shortly before the commencement of this litigation. First, 15 U.S.C. § 1127 provides that "[a] mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." Therefore, Defendants have not established—even made out a prima facie case—that Plaintiff has abandoned the use of the original Broadband Daily mark, as Plaintiff's nonuse of that mark has lasted for a period months, rather than the statutory three years. Additionally, Defendants' redesign and eventual dissolution of the Broadband Insight website speaks to the issue of potential damages, not of liability. A plaintiff does not fail to state a cause of action under the Lanham Act because the alleged infringement may have only lasted for a brief period. Indeed, the Act provides that when a violation of Section 43(a) has

been established, the plaintiff may be entitled to recover (1) the defendant's profits, (2) damages sustained, and (3) costs of the action. 15 U.S.C. § 1117(a); *see also Larsen v. Terk Technologies Corp.,* 151 F.3d 140, 150-51 (4th Cir. 1998) (granting damages based on defendant's profits during period of infringement). Plaintiff has not been afforded the opportunity to conduct discovery on whether any of its business may have been diverted to Defendants during the period of alleged infringement.

Accordingly, while Plaintiff may not ultimately be able to demonstrate that there was any likelihood of confusion between Broadband Daily and Broadband Insight, or that it suffered any damages as a result of Defendants' alleged trademark infringement, the Court concludes that, at this juncture, Plaintiff has stated a claim under Section 43(a) of the Lanham Act sufficient to survive Defendants' motion to dismiss.

### Count V - Common Law Trademark Infringement and Unfair Competition

Count V asserts a claim for trademark infringement and unfair competition under Maryland common law. The same legal framework applies to both federal and common law trademark infringement claims. *See Perrini Corp. v. Perrini Construction, Inc.*, 915 F.2d 121 (4th Cir. 1990); *A.C. Legg Packing Co. v. Olde Plantation Spice Co.*, 61 F. Supp. 2d 426, 432 (D. Md. 1999). Thus, for the reasons stated in the Court's discussion of Count IV, Defendants' motion to dismiss Count V will be denied.

### Count VI - Common Law Duty of Loyalty

The Complaint alleges that Brumfield breached her fiduciary duty of loyalty to Plaintiff by making arrangements to compete with Plaintiff prior to her termination. Specifically, the Complaint alleges that, prior to dismissal, Brumfield misappropriated P&F trade secrets, made unauthorized

copies of P&F copyrighted materials, intentionally erased materials from her P&F laptop computer, made unauthorized use of the Broadband Daily mark and name, and absconded with work-related documents. (Compl. ¶ 134.)

Maryland law protects the ability of employees to resign and compete.  In *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564 (Md. 1985), the court recognized the tension between the duty of an employee to "act solely for the benefit of his employer in all matters within the scope of employment" and "society's interest in fostering free and vigorous competition." *Id.* at 568. As such, employees generally may prepare to compete with their employers prior to leaving their jobs without fear of breaching the fiduciary duty of loyalty.  *Id.* at 569. This privilege, however, has its limits; it will not immunize an employee from liability "where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future." *Id.*  The *Maryland Metals* court cited numerous examples of misconduct that would defeat the privilege; among them were misappropriation of trade secrets and misuse of confidential information. *Id.* This is precisely the behavior Plaintiff alleges: "[Brumfield] misappropriat[ed] P&F trade secrets; [made] unauthorized copies of P&F copyrighted materials and other confidential and proprietary information . . . ." (Compl. ¶ 134.)  Therefore, Plaintiff has stated a claim under Rule 12(b)(6) for breach of the fiduciary duty of loyalty.

## V.        CONCLUSION

For the reasons stated above, the Court will GRANT Defendants' Motion to Strike [6],

DENY Defendants' Motion for Attorneys Fees [7], and GRANT-in-part and DENY-in-part

Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [5]. Specifically,

Defendants' Motion to Dismiss will be GRANTED as to Counts I and II and DENIED as to

Counts III, IV, V, and VI. An Order consistent with this Opinion shall follow.


January 25, 2006                                                    _____/s/_____
Date                                                                          Alexander Williams, Jr.
                                                                              United States District Court